Good morning. May it please the court, I'm Bob Wiggins from Birmingham and I represent the plaintiffs. The principal error we believe in this case, Can you speak up? I know that we're not very formal. The primary error we believe in the district court's decision was the court's decision not to follow the findings on the 27 promotions from 1999 and 2000 that this court made in the first appellate mandate in 2009. The court, this court examined those 27 promotions and ruled that they should be included in the statistical showing of a general policy of discrimination. On remand, I don't, I don't think that, I don't, I'm not sure that's the correct reading of our brief. Those 27 promotions were put in in 2000. On page 20 of your reply brief, you say plaintiffs submitted those 27 forms the very first time the issue was raised below, which was not until September 11, 2012, three years after this court's payment. Oh, the underlying form, yes, but the evidence was put in through the expert testimony and the expert report. It was listed as Exhibit 2 in the expert's deposition from back at the original submission. This entire issue was in front of the district court. Nucor never raised a question about those 27 promotions. It never raised a question about these nine that were not part of the 27. It never contended that there were any of the 27 that weren't true promotions. The only thing they ever raised prior to the first appeal was that you shouldn't count them at all. This court ruled on that issue and the district court was not free to then go behind that ruling and start picking at the 27. And particularly it couldn't do it on a clearly erroneous finding that these nine that were questioned were part of the 27 to begin with. There's just no question that those nine have nothing to do with the statistics in this case. They were not included within the statistics. If they had been, they were clearly promotions. They showed on their face they were promotions. And they would have increased the racial disparity, not decreased it. The district court did not find otherwise. So we contend that's the primary error for the court not to follow a finding, a determination made in the first appeal that was as clear as that determination was. Now, secondly, we believe that this court's mandate is consistent with Walmart. The controlling case in this circuit on how to apply Walmart to a Title VII case is Scott v. Family Dollar. Scott says that Walmart still permits the plaintiff to establish a common issue and a predominant issue through either a disparate impact claim, which was called a biased testing claim, although testing includes criteria that act like a test. It doesn't have to be a pencil and paper test. Or a pattern or practice that shows a general policy of discrimination. Walmart clearly says we can use either one of those. And the mandate in this case clearly held that we had sufficient evidence to cover both methods, a disparate impact method and a general policy of discrimination method, better known as a pattern or practice form of proof under Teamsters v. United States. Walmart specifically quotes and reiterates the Teamster standard. That standard holds that individualized questions are not at issue in Stage 1 of a pattern or practice general policy of discrimination case. That you are not permitted to go into individualized questions at Stage 1. Because the question at Stage 1 is whether the pattern or practice exists. Whether the general policy of discrimination exists. That's the sole question at trial on the merits. If the answer to that question is yes, a general policy does exist, injunctive relief is entered at Stage 1. The case is over with for that claim to injunctive relief. There is never any individualized evidence at any stage of the case. The second consequence of a Stage 1 finding of liability, general policy, is a presumption that each class member was affected by that. It's a rebuttable presumption. But it carries into Stage 2 where the defendant gets the opportunity and the plaintiffs get the opportunity to test the question of whether particular class members who file a claim, we don't even know who's going to file a claim or how many will file a claim at Stage 2. But those that do, both sides will get a chance to then put on any individualized evidence. But that evidence is not relevant. It's not even permissible at Stage 1. And that's why a Teamsters type claim, which Walmart permits, satisfies the commonality and it creates a predominant issue under Rule 23b-3. It's predominant in the same way that the Supreme Court ruled last year in Amgen is predominant. And that is if the answer to the question at Stage 1 is no, there's no general policy, the case is over for the whole class. You don't break down into individual claims. The case is just over. And Amgen says when you have that type of situation where the answer to the common question covers everybody, it's either yes or no for everybody, there's either a general policy or there's not a general policy, then Rule 23b-3 is satisfied. The commonality standard is satisfied. And that's what was found and determined in the first mandate. Where do you attack the trial court's predominance analysis? I was looking through your brief for a discussion of 23b-3 and I didn't really see it. It sounds like you're challenging it through an analogous reach at the commonality issue, but I don't see a direct discussion of 23b-3. Could you tell us where it is in your brief? Yes. Or do you agree that it's not there? No, it's there. We appealed the decertification. The decertification was based on b-3. That's the only grounds we could appeal. No, but I'm asking you where in your brief do you discuss the trial court's analysis of the predominance issue? We discussed it when you look at the brief, and I don't have the paper, but when you look at our discussion of Amgen, which is a b-3 case, that is a discussion of why the district court's decertification satisfied b-3. Now, we didn't spend a lot of time just quoting the word b-3 because that was the sole basis of the ruling below. That's the only thing we could have appealed, that we're permitted to appeal, was the decertification order, and it was solely a b-3 determination. Now, secondly, the district court treated the b-3 as part of the commonality issue. It said because there's no common issue, there's no predominance, that you don't even get to the question of predominance because you don't have a common issue to begin with. So we necessarily had to argue first that there's a common issue before we could show that it's a predominantly common issue, that it predominates over the individual issues, and that wasn't our choice. That's what the district court framed it as, and we felt like that's what we had to discuss and present, to show that because there's a common issue, first, the district court erred in holding there was not a common issue, and then to show that that issue under Teamsters and under Amgen is predominant for the reasons I've given about Stage 1 versus Stage 2. This case, though, also fits exactly within the interpretation of Walmart and Comcast in the Scott versus Family Dollar case because we also had claims of biased testing. We had statistics that fit the class exactly. The problem in Walmart was that they had a disconnect between regional statistics and local decisions. There was no such disconnect here. Here, the problem in Walmart was that they had 1 in 12,500 ratio of the anecdotal evidence. Here we had 1 in 8, which is, we had a little better than 1 in 8, which is what Walmart says is the model from Teamsters. We had evidence that the district managers, not the district managers, the department managers have input and control not just over the decisions in their department, but their input and their recommendation is necessary for you to move to another department or for someone from another department to move into that department. So this idea that the department managers are isolated in their own department is just not true under the written policy. You're relying on the language of Brown 1, aren't you, for that point? And also the written policy of the company, which says it flat out that the department managers have input in cross-departmental decisions, both coming into their department and going out of their department. So the idea that the department managers are isolated, unique, stand-alone entities, is just not borne out by the record. You also have the hostile environment evidence, which is directly relevant to a pattern of practice of discrimination under Teamsters. And the district court found that that evidence was cross-departmental, not isolated to the bean mill. And you have also a plant-wide posting and bidding, a written plant-wide posting and bidding procedure, in which employees don't just bid in their department, but they're posted plant-wide so they can bid across departments. So you don't look at just where the employee works, you look at where he wanted to work, where the better jobs were, where he wanted to have an opportunity. And we think the evidence shows that there is a departmental preference policy here, that if you are already in the department, you're preferred over those not, that they have crews, they work in crews of 8 to 12 people, and those crews are largely racially segregated. So that when you apply a prior experience requirement, or a departmental preference to a segregated pattern, you're going to perpetuate that segregation into the present. It's just a neutral way of keeping the discrimination and the segregation going. And that, under Griggs, and this Court's opinions in Patterson v. American Brands, or Hairston v. McLean Trucking, other circus decisions such as Petway v. American Cast Iron Pipe, has always said that those type of department preferences, or prior experience credits, perpetuate discrimination and violate the Act. And that's the type of biased testing that Walmart says is certifiable. Why? Because you don't look at individuals, you look at, first, statistics, and second, is there a business necessity for that practice? Business necessity, obviously, is not individualized. It's either voted up or voted down for the class as a whole. The statistics, they're voted up or voted down for the class as a whole. And, therefore, it's common. And under Teamsters, it's predominant. Because you don't get to any individualized issues until Stage 2. So, we believe that the District Court erred both factually in not following the finding about the 27 promotions, not following this Court's determination that the statistics were independently sufficient, not then looking at the direct evidence, which this Court found to be independently sufficient, not looking at the anecdotal evidence which satisfied the Walmart 1 in 8 standard. It simply resisted the idea of doing anything about promotions. It's okay, it certified the class, did not decertify the class, on the hostile environment. But to have a true remedy, to really do something in this plant, requires doing something about promotions, not just the hostile environment. Thank you. Thank you, Mr. Wiggins. Ms. Platt? Thank you, and may it please the Court. The trial court properly reconsidered class certification in light of Walmart for two reasons. First, this Court embraced the then extant but now erroneous principle that discretionary decision-making alone is a common issue. And, second, this Court endorsed the then extant but now erroneous principle that courts at the certification stage may not examine the evidence in depth. As to the first issue, in ordering certification, this Court stated that discretionary decision-making alone is a common issue. Of course, we now know after Walmart that a policy of allowing discretion is the antithesis. No, that's not correct. Brown 1, we did not do that. We engaged in the process of looking at the evidence, and we did not say that alone was the basis of it. You're misreading Brown completely in that regard. Go ahead with your argument. Well, you stated it. So you then went on and stated other things, but there's no question you cited Lilly and other cases that are just— We did, but also it clearly indicates the analysis that was done, an in-depth merit decision. Well, let's go through that. Let's go through that. Let me finish my question. To you. Your broad statement about what we did is incorrect, because we did cite cases where we talked about an in-depth merit review is not required. The merits ultimately of this case's trial will be done so. But you're right. Walmart does require a rigorous, and we did so in that case, and it stated so. You may disagree with it. As a matter of fact, I know you disagree with it, but don't state that we did something that we didn't do. Go ahead. All right. Well, I mean, we can read the decision together, but the bottom line is we know now that the centrality of this complaint is no longer valid after Walmart. The centrality of this complaint is that this is totally—Walmart is a— Walmart was a decision that really is an extension of Twombly in terms of it certainly heightened the pleasing requirements, no question about it. But it did not outlaw class action cases in Title VII. It didn't do that. In this case, the central question is, at least as alleged, and we have to take it as true, the insidious discriminatory practice maintained by New Corp. In terms of the loudspeaker, we've already determined that's plant-wide, and the district court did so. Okay, but we're talking—this is a promotions class. I know a promotion class, but the promotion class is based upon what the broad unifying rule in this case. Right, and if there's 12,000 pages of a record here, and the court extensively reviewed it now twice, and on promotion decisions, no matter how you slice and dice the facts here, the court has found that there is not, as a whole, discrimination in promotion decisions that are spread throughout the company, that the evidence that this court cited in chapter and verse was confined 100% in toto to the bean mill, all the evidence the court cited. Now, that's not on this—the radio, which I have to say, the record says it's department-by-department radio. It's not a PA system. It is a plant-wide radio, but everyone— the bean mill has a different radio channel than the cold mill and the hot mill. Did this court find that it was unified in terms of— it affected all six departments? Did this court— On the hostile working environment, because they share a locker room, which has nothing to do with 55 separate managers making independent promotion decisions on discretionary criteria that widely varies from department to department, and the court found— But that's the thing. You're trying to put yourself in those Walmart cases where we're talking about gradations of whether or not a person may be qualified, how long they've been here, but this is a case that's clearly the only—as alleged, is that the practice was if you were black, you didn't get promoted. That's what's alleged. Okay, but let me with all respect say that's not true. The policy that's alleged is allowing discretion. They have allegations that, in our view, are inaccurate, but the allegations of discriminatory bias that's harbored by actual supervisors as opposed to coworkers is confined not exclusively but by and large to the bean mill. You're right. It is discretion because, in a sense, you have discretion, but the overriding practice is the only criteria for not getting promoted, for being harassed, is having black skin. There's nothing else. That's what's alleged. I know you disagree with that. No, but that's fine. If a plaintiff wants to bring a lawsuit, great. Maybe he will prove his case, but that has nothing to do with a class action where this court held in Family Dollar that the plaintiff has to demonstrate that any discretion is applied by all managers in a common way with common direction, and I'm quoting from Family Dollar again here, that the plaintiff must demonstrate that a specific policy is tied to a specific employment practice that affects the class uniform. They've got two huge problems here. It's on statistics and anecdotes. You can't make stuff up. You can't just say it's in the complaint. Is your client who, what, misplaced or didn't keep the records, right? And, for example, you're complaining about the status change forms, and is it correct from December 1999 to January 2001, you don't have those records at all? Right. There are two problems with their reliance on statistics. There are no records with that 13-month period, and we know from 2000 on where there are records that there's no statistically significant racial disparity. But if I could just go back, though, to the Eighth Circuit's Bennett decision, you have a court of appeals decision that has a very similar new court plan and applied Walmart in two ways and said, no way, no class action because of decentralized decision making. In that case, did they have any public address system making jungle sounds and calling in that case? Did they? Yes or no, counsel, in fact? I don't know. I know that the allegations are of the Confederate flag. Counsel, you raise an Eighth Amendment case that has no precedent here. You ought to know the facts of the case since you're saying we ought to be informed by it. So did they have those type of insidious racial clear animals like in new court in the South Carolina plan? Yes or no? I don't know whether coworkers in Arkansas. Counsel, you don't really know the facts of the Eighth Circuit case that you're urging us to follow? All I recall about the Eighth Circuit case. Answer my question, counsel. Are you here representing as counsel a case that we should follow and you don't know the facts of that case? Yes, because you should follow the law in that case. And the other thing that that case says is on the statistical analysis. The law doesn't exist in the ether. The law exists in the context of facts. Yes. And that informs the factual, the legal analysis. So I think that rather than argue with Judge Gregory, it might be more productive for you to tell us about why your analysis is not confined to the facts of the case you're citing. Right. So in the Eighth Circuit case, which is a single new court plan that's divided with similar plans, the Eighth Circuit, there were two problems that are the same problems here. And that is there wasn't the pattern because of the various independent departments that are all discretionary and widely different criteria that desensitization excluded the idea of a common issue. And that's under family dollar. You can't have low-level decision makers employing discretion and have a class action unless you show they exercise it in a common way with common direction. The other significant thing about Judge Collington's opinion in the Eighth Circuit case is on the statistics. After Walmart, Walmart holds that even if you have valid statistics of racial overall disparity, that doesn't show that individual decision makers discriminate against the class on a uniform basis. And to quote Bennett, that an overall, the bottom line statistical analysis is plant-wide, even if it showed that there was some disparate treatment or disparate impact in one of the departments, that doesn't necessarily mean that that discrimination was common with respect to the others. Is there a distinction in making this point between disparate treatment and the evidence of disparate impact in this case? If so, could you elaborate? Sure. After Walmart, you cannot have a class action based on disparate impact just by saying there's independent discretion. What Walmart leaves open is a disparate treatment case that's based on a general policy of discrimination that's widespread throughout the company. And they can try to do that by two ways, and this is Teamsters, anecdotal evidence and statistical evidence. And they have the same problem with both times, is that the district court, under an abusive discretion standard, went through the evidence and there's not the, there are allegations of some people applying outside the BMIL who allege they were denied promotions based on race. But the overwhelming evidence of discriminatory bias by supervisors, and I'm distinguishing here between supervisors making promotion decisions based on permissible discriminatory criteria, and racial harassment in the locker room by co-workers. That stuff, as insidious as it is, has been certified as a class. There will be, unless- I realize that's a separate claim. Right. And so there's no evidence linking that co-worker discrimination to the type of supervisor discrimination, and when the declarants and the evidence was so concentrated in the BMIL. What about the declarations in this case? Weren't there 16 of them and six employees were not BMIL employees who made specific allegations? So five. So 11 of the 16 declarants are in the BMIL. But there were issues of cross-training weren't there, and being denied cross-training opportunities. Let me finish and then you respond, if you would. Sure. And then also issues of having to have your supervisor recommend you for movement between the two.  They clearly are part of your analysis. It's just the evidence is too thin here. Of course you look at that. The problem is the evidence about cross-training, again, where there's two of the declarants that are BMIL declarants, Conyers and Guy, allege, I can't get out of the BMIL. My supervisor won't let me cross-train. He's not saying there's discrimination in other departments. He's saying my own supervisor is racist and I can't get a better job. Now, Guy is an excellent example because the cold mill offered him a promotion. The cold mill that they say there was discrimination offered this African-American promotion, but his BMIL supervisor wouldn't sign the paperwork. Well, he might have a very good lawsuit, but that doesn't mean he has a class action to represent all the BMIL employees. I'm sorry, all the cold mill, all the maintenance, all the shipping, all the hot mill. That's where it's lacking. Now, I'll give you, there are four instances the way I count them, that where you have declarants either trying to get out of the BMIL or you have a shipping declarant, Beaufort, and you have a hot mill declarant, Nick, that allege they were denied a promotion outside the BMIL. So that's two. What about Simmons and Ravenel and Guy and Conyers? Are they also in that category? Simmons and Jacob Ravenel are BMIL employees who allege they tried to get out of the BMIL. So that's your other two. But they were denied promotions in other departments. Right. So that's four. Then there are two declarants, Earl Ravenel and I forgot who the other one that was, and Singletary, who just say they never applied for a job, but they were discouraged. So that's it. And that's why the district court says, look, aside from the promotion decisions where people are saying I'm qualified, I thought I was qualified, I didn't get the job, and I think it's because I'm black or African American. So that's what they say. There is the overwhelming evidence of actual discriminatory bias. The really bad stuff is all in the BMIL. It's by Mr. Ferguson and three or four supervisors. And that's why the court said it's concentrated. Now, on the statistical analysis, if we can get past the mandate issue, and, well, actually, there's, again, two problems. Isn't it correct that in Newport, before the EOC complaint, this plant had never had a black supervisor? No, and I'm so glad you raised that, because Mr. Roberson is a department manager of shipping. Mr. Roberson, he's African American. He was promoted before the lawsuit and before the EOC complaint. And when was that? 2001. Oh, 2001. Was he the first, 21st century? Well, the plant opened. I mean, the plant doesn't get off the ground to, like, what they say, 1999. So whether he was the first, second, or third, also, Andre Porsche in the other words, the follow through is whether he's the first, second, or third, does that matter? Is that what you're going to say? No. The problem is that there's a misstatement that they had not hired an African American before the lawsuit. So to the extent that that's a bad fact, it's not true. The other point is the supervisor, Andre Porsche, who's in the hot mill, also promoted before the March 2002 EOC complaint. Now, that's a good example because the shipping is where Mr. Beaufort is. So you have, admittedly, you have mixed results in the hot mill. So that's what the court's saying. It is a massive record with declarations, depositions, affidavits. There is stuff in the beam mill that this district court said he would have certified a beam mill class. But he's having a problem saying, why should I cannot have the cold mill, the maintenance, the shipping, the hot mill, and I feel like I'm missing a department, all cast in with these people. But I can also just talk about the statistics. Because, again, I think the anecdotal evidence, and unless you're going to go through these pages and somehow find an abuse of discretion, but the declarations, I'm taking them at the face value. The other thing I want you to keep in mind if you read them yourself is the So there's examples of Mr. Butts and Robin Spann that allege discrimination, but they're either before the class period or they're in more recent time, which the court says is not relevant. If I could turn to the statistics, again, I think this court does have to address it's not just the Bennett decision, it's the 10th Circuit in Tabor that says, after Walmart, you can't just take a plant overall statistical analysis. You've got to break it down and make sure, even if you have completely valid statistics, you can't take one department and assume that that's the same treatment as other departments. Walmart is such a different case from this case in terms of scope. Oh, sure. Nationwide, thousands of employees, untold numbers of stores. And what we've got, and this court, round one, did say this was a unitary operation. I mean, it rejected the attempt to compartmentalize very clearly. For hostile working environment, for locker rooms and cafeteria, that people do not make promotion decisions in a locker room. No, I agree. No. You're very naive. I'm not naive in that. This looks like a campus. People don't make promotion decisions in other places other than, in fact, on the campus? Unless it's a supervisor, sure. My coworkers may harass me all the time. It has nothing to do with how I'm getting promoted. Do they make decisions on golf courses sometimes, do you think, in jobs? I've never been on a golf course. Oh, okay. That's why you would make a statement that these decisions are confined to the campus. If the court had found evidence that the hostile working environment had a bearing on promotions, the other side can cite you that page. I don't see it. The other thing the other side has a problem with is that this court, I mean, the district court found, again, the promotion decisions, the discrimination, that's bad, is in the bean mill. If I could just get back to the statistics on the problem here, I think it is far from clear that this court intended to do anything beyond credit the statistical analysis at face value because the court recognized that the dissent's critique of the evidence may very well discredit these statistics later. And we know after Wal-Mart that later is too late. The court at the certification stage can actually peer into the reliability of the statistics. And the district court – But what about Wal-Mart changed that? I mean, Wal-Mart really speaks to the issue of discretion. It doesn't talk about reexamining. I mean, rigorous analysis was in the legal lexicon long before Wal-Mart. So it seems to me that what you're trying, I don't want to say trying to do, but what the defendant would like us to accept is the proposition that the legal analysis has totally shifted. It hasn't. We had the terms rigorous analysis before. Judge Keenan, I really appreciate your question. It's a really good point. And the bottom line comes down to do we think Wal-Mart's a one-off or do we think it's a sea change? And I think the district court was quite fair in saying, hey, Wal-Mart just quotes a lot of stuff. It quotes Eisen. It quotes Falcone. These are – Well, it's obviously a sea change in discretion. But to what other – So what the lower courts have done, and they've done this even post-Wal-Mart, in that Bennett case, in the Ninth Circuit, in Wang, and in the Tabor case, these are either single department or single plant sizes, 200 employees. Bennett was 100 and said, these cases look a lot different than those 3,400 stores, but we still discern these two overarching principles of Wal-Mart, that you have to do a significant proof of commonality. I mean, you can say the same thing about Comcast. In a lot of ways, Comcast was simply error correction. It was pulling it back a little bit. Yeah, but everyone thinks of Comcast as a sea change. But if you read Comcast, it just appears to be applying current law in the same way with Wal-Mart. So the question is, is all the courts, district courts and courts of appeals, have said, whether it's a clarification or whether Wal-Mart is just saying, hey, guys, we really mean it. We said it before, but we really mean it, and we had some confusing language in Eisen. Who really knows? And it is true. Wal-Mart was a colossal disaster with 1 million employees. But case after case have applied it to single facilities and even single departments. And on very similar facts, and I don't know about the plant-wired radio, but there's a district court decision on point that goes through all the allegations. But the promotion arguments are very similar, and the statistical analysis is very similar. If I could just go through the statistics on the district court, because I do think this is the kind of area where abuse of discretion screams quite loudly, because what the district court did, it found two very specific statistical problems. And I do want to point out about the lack of records, whether they were destroyed or not retained. The district court said, you've been complaining, plaintiffs, for years now about no discovery. And my bad. The Court of Appeals has told me I've got to bend over backwards. Come to me with a discovery request. The whole oral argument here in 2009 was the plaintiffs saying, we need more discovery. The plaintiffs can ask for more documents. We are open to giving to that so they can try to come up with more reliable statistics. They complained they had such a small set of data pool to try to come up with this alternative benchmark. Even their experts said, we need more documents. And so the district court said, look, your analysis today is fundamentally unreliable. It's inherently faulty. Try again. But he said, I'm open, even though it's been 10 years now, I'm open to more discovery. The biggest problem with those 27 change of status forms that were not in the record is I don't know why the plaintiffs said, I really don't know. It's inexplicable that he said they all say promotion. Three of them are demotions or transfers. And then there are at least two that are ambiguous. But a bigger problem with the statistics is that the expert assumed that an African-American applied for all 27 jobs when she had no way of knowing other than the one African-American who was selected for promotion. So she assumes that only one African-American was promoted out of 27 jobs. But her assumptions, and this is very, very key to understand, her assumptions are based, and again, the plaintiffs are really, really upset about it from a data pool that Nucor gave them that was handpicked, preselected from a much larger data pool that ensured an African-American applied for every job. So this, she took, in other words, she used an average taken from a data pool that exclusively was ensured that an African-American applied and applied it to a data pool where it's not clear that any African-American applied. And so it may be that she just needed more documents, and that's what they were complaining about all along. So I just want to make that clear that there is that room for discovery. The only other thing I'd want to comment is – That red light is not just a suggestion. Oh, I'm over. Oh, goodness. I am so sorry. Go ahead if you have something burning. Go ahead. No, no, no. I know you just ignored it. No, no, no, no. Go ahead. Finish if you have something burning. Go ahead. I could ask you a lot of questions. Go ahead. Go ahead and finish. You know what? Go ahead. I forgot what it was. I am so sorry. This light is confusing. I'm sorry. All right. I have to agree that when that starts recounting going up, it is confusing sometimes. That's why we look at the lights. It was red no matter what the numbers were. I've done that myself. Yeah, right. I'm going to start with the last point first. The judge said in his decertification that we could come back to him for more discovery. We went back to him, and he wouldn't give it to us. Also, we've been at this for 10 years. To start over again on something this clear is just what we think would be an abuse of discretion. It was argued a moment ago that the problem with statistics is it assumes that people applied. Well, it has to be assumed. They destroyed the records of the bids. There's no way to know. They didn't offer any supervisors that could maybe remember, I doubt it. It's a completely bogus argument to say that the statistics are bad for the 1999 and 2000 period because a change of status forms don't show bids. That's right. They're not bid records. They destroyed the bid records. They want to confine this to the bean mill and pretend that the evidence is confined to the bean mill. It is not. Just as she said a moment ago, these statistics cover all six departments. Newcorp picked them. We didn't get to pick them. They picked them unilaterally. They applied a test, what they called a similarly situated test, and the district court found these promotions are similarly situated across all departments, all six departments. And that's the way this case went through the original submission, the only submission. There's never been another one. It was then, after they said these similarly situated jobs apply to all six departments, they then on the appeal shifted and said, oh, well, it's limited to the bean mill. The fact is these promotions that the statistics are based on are based on their criteria of what is similarly situated. They define it as similar pay, similar grade, and similar experience required to get promoted and that there be a black bidder. That was all them. We didn't agree with it, but we were stuck with it. We then took the data we got, we ran the numbers, and it showed significance, statistical significance, at greater than two standard deviations if you include the entire period, not if you truncate it. And this court, that is the mandate, that you can't truncate it. Bennett, the Eighth Circuit decision, there was no statistical significance in that case. That was not the same record. Yeah, I was trying to get to the facts, but I'm like, go ahead. Quite naturally, we had trouble establishing a general policy when we had no statistics that showed a general policy. That's the opposite at this point. When we originally filed this case to cover all plants, and we filed it in Arkansas, the defendant came in and said, these plants are standalone. You can't put the Arkansas plant with the South Carolina plant. We conceded that point. The South Carolina plant was transferred to Charleston. And ever since then, they've been treated as separate plants. The idea that you can doubt the findings of this court on this record by looking to that case on a different record, I don't understand it, and I don't think it's a valid argument. Also, if you look at Bennett, it was against Nucor-Yamato. Nucor-Yamato is half Nucor, half Yamato. It's not a purely run Nucor plant. And what should we take of that? It's not even the same practices. It's not even the same company. It's a 50-50 partnership between two different companies. That plant in Arkansas, the Charleston plant, is a 100% Nucor-run plant. They've tried to limit the declarations by looking at where the employee is working. And I've already said, and they haven't replied, this is a promotion case. You look at where they want to be promoted, not where they're stuck. The fact that someone's in the bean mill does not mean they want to be in the bean mill, or if they're in the hot mill, they want to be there. The statistics showing the general policy, the declarations showing the 1 in 8 pattern, that corroborate the statistics, are across all departments. They're not limited to the bean mill. And the district court was wrong on that point. Thank you. Thank you. We'll come down and greet counsel and then proceed to our...
judges: Roger L. Gregory, G. Steven Agee, Barbara Milano Keenan